IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2024

## CHRISTOPHER A. DUNCAN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Cheatham County**
**No. 17870     Larry J. Wallace, Judge**

_____

### No. M2023-01549-CCA-R3-PC

_____

The Petitioner, Christopher A. Duncan, appeals from the Cheatham County Circuit Court's denial of his petition for post-conviction relief from his convictions for attempted second degree murder, aggravated arson, especially aggravated kidnapping, aggravated burglary, and theft of property valued at more than $2,500 but less than $10,000, for which he is serving an effective seventy-eight-year sentence. On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel allegations for trial counsel's failure (1) to file motions to suppress, (2) to file a motion to sever his trial from that of his codefendants, (3) to file a motion to dismiss count five of the indictment relating to theft of property and to object to other evidence relating to the theft of the victim's car, (4) to request jury instructions for facilitation of a felony or accessory after the fact, and (5) to object to the State's witness vouching during closing argument. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Manuel B. Russ (on appeal) and Timothy Wills (at post-conviction hearing), Nashville, Tennessee, for the Appellant, Christopher A. Duncan.

Jonathan Skrmetti, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Ray Crouch, Jr., District Attorney General; Margaret Sagi, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

The Petitioner's convictions relate to an April 11, 2016 home invasion during which the Petitioner and codefendant Ariel Robinson assaulted, bound, and robbed the victim, attempted to shoot the victim, and set fire to the victim's home. This court affirmed the Petitioner's convictions. *See State v. Ariel K. Robinson, Christopher A. Duncan and Timothy David Shoffner*, No. M2020-00058-CCA-R3-CD, 2021 WL 1020913 (Tenn. Crim. App. Mar. 17, 2021).

The facts at the trial were summarized by this court as follows:

> The victim . . . said that, on April 10, 2016, he worked on his house all day. He then purchased some beer, drinking a six-pack right before he went to bed, still fully clothed, at 11:00 p.m. or 12:00 a.m. in the bedroom located on the main floor. His wallet and keys were in the front pocket of his clothing. The victim recalled being awoken by a female, whom he later identified as Defendant Robinson, shaking him and telling him repeatedly to get up. When he awoke, there was also a man, whom he later identified as Defendant Duncan, in the room, and the two told him to go from the bedroom into the living room. Thinking they were law enforcement officers and seeing that at least Defendant Robinson was armed with a gun, he complied with their request.

> When he went into the living room, the victim complied with Defendant Robinson's orders to sit down on the floor with his hands raised, as if he were being arrested. The assailants took off his $185 Citizen watch and $100 gold ring, and the victim determined that he was being robbed and not arrested. The assailants, neither of whom wore face-coverings for the duration of the events, then bound his hands behind his back with duct tape and bound his crossed legs together at his ankles. The victim recalled that Defendant Duncan bound him with duct tape while Defendant Robinson gave the victim instructions with which he was to comply. After he was bound, the assailants took the contents of his pockets, including his billfold and a knife. The victim watched as Defendant Duncan went through the house in what appeared to be an attempt to find things of value. He emptied the victim's drawers, and there were papers all over the bedroom, which the victim could see from his position in the living room.

> The victim recounted how the assailants asked for the PIN number to his ATM card, which he attempted to provide to them. Defendant Robinson asked the victim how to open the victim's white Samsung 3 Galaxy phone, and he told her that she must make a zig zag with her finger

-2-

on the face of the phone.  She did as he instructed, and she used the phone to place a phone call to a third person, to whom she relayed the PIN number. When the third person informed Defendant Robinson that the PIN did not work at the ATM machine, Defendant Duncan kicked the victim both in the body and the head and asked him for the PIN number again. The victim again provided it, but again it did not work, and Defendant Duncan again kicked the victim. He then pointed a gun to the back of the victim's head and forcefully asked for the PIN number.  The victim again gave him the PIN number, swearing to the assailants that it was the proper number. This happened four or five times.  At one point, Defendant Duncan became so incensed that the PIN number was not working that he fired the gun inside the home.  The victim said that it was not until after this incident that he realized that he had accidentally given the assailants the wrong PIN number.

The victim testified that Defendant Robinson discussed the security system in the home, and the victim told her truthfully that it was not working.  She instructed Defendant Duncan to remove it from the victim's pantry anyway.  On a desk near the pantry, the victim kept his computer, a red digital camera, and other odds and ends.  The victim estimated that, after he had been bound for approximately one hour, Defendant Robinson said to Defendant Duncan that they had been there long enough, and the victim watched as Defendant Duncan left and returned with a gasoline can. He poured gas out on the floor from the front door towards the home's fireplace, turned around, and poured it as he walked back toward the front door.  Defendant Duncan looked at him and said, "I don't want to kill ya," but then turned around and lit the room on fire. The victim said that the room filled with black smoke quickly.  He noted, however, that the mudroom door was open, so he scooted on his hands and knees out that door and then down the basement steps.

He went into a bedroom downstairs to hide, and he got his left hand loose before both assailants came down into the basement looking for him. Defendant Robinson pointed the gun at him, the victim held up his hand, and Defendant Robinson said that she did not have to kill him because he had no idea who she was and had never seen her before.  Defendant Robinson then attempted to fire the gun at him, but the gun did not work. She attempted to fix it and fire it again, but it again did not work. Defendant Robinson said something to Defendant Duncan and left, and Defendant Duncan shot his gun at the victim twice, but seemingly intentionally missed high over his head and to the left. After shooting, Defendant Duncan also left.  The victim used his left hand to unbind his

legs and right hand and then ran to his niece['s] . . . house, who lived nearby. . . . .

. . . .

The victim recalled that, after the attack, law enforcement officers showed him pictures of suspects. He was unable to identify any of them with certainty from the photographs. He said, however, that when he saw the defendants in person, including Defendant Robinson's unusual physical shape, rather than in a photograph, he was able to positively identify them.

. . . .

Lieutenant [Shannon] Heflin [with the Cheatham County Sheriff's Office] sent Jeremy Ethridge, a sergeant with the Cheatham County Sheriff's Office, and Jason Hundley [footnote omitted], who was a sergeant with the Cheatham County Sheriff's Office at the time, to retrieve F&M bank statements for the victim's account and surveillance videos, including one from the Kangaroo Express. Sergeant Ethridge and Mr. Hundley viewed the video from the Kangaroo Express and saw a white male exit a vehicle and come inside the store, go directly to the ATM, and attempt to use the ATM. The man was wearing a black Adidas jacket or pullover and an Atlanta Braves baseball cap. . . . . Sergeant Ethridge gave both videos to Lieutenant Heflin. Lieutenant Heflin said that the Kangaroo Express video also showed another man, dressed in a Tennessee Titans jersey and blue jeans, driving up to the store in a blue Mercury Grand Marquis, that can [sic]. The video showed that man exiting the driver's side of the vehicle, coming into the store, and attempting to use the ATM card.

Lieutenant Heflin testified that videos from multiple locations matched photographs of Defendant Shoffner and the photograph from his driver's license. He learned that Defendant Shoffner, whom he identified from the ATM surveillance footage, resided with Defendant Robinson, and he sent Agent Ethridge and Mr. Hundley to her address on Cynthia Drive to make contact with her. When Agent Ethridge and Mr. Hundley arrived, both Defendant Shoffner, who was speaking on a cell phone, and Defendant Robinson were home with guests. Defendant Robinson gave the officers consent to search her home. . . . .

. . . .

-4-

Lieutenant Heflin also went to the residence and spoke with Defendant Robinson[.] . . . The lieutenant obtained cell phone numbers for each of the three defendants, and he obtained search warrants for their phones. . . . .

Lieutenant Heflin then went to the Burkhart Trailer Park where he encountered Defendant Duncan driving the blue Mercury Marquis seen in the ATM video. He had a female passenger at the time. The lieutenant immediately detained Defendant Duncan and offered him *Miranda* warnings. The lieutenant recalled that it was raining heavily, so he patted Defendant Duncan down for officer safety. During the pat down, he recovered a white cell phone from his left jacket pocket, along with some "paperwork" belonging to the victim, which he immediately put into a plastic bag to protect it from the rain.

Defendant Duncan told Lieutenant Heflin that he had attempted to use a debit card at the Kangaroo Express earlier that morning. He consented to a search of his vehicle. In the vehicle the lieutenant found a red digital camera and a roll of Gorilla duct tape. After searching the vehicle, Lieutenant Heflin had the vehicle impounded, obtained a search warrant, and again searched the vehicle a few days later. In it, he found a black knit cap and a black cell phone.

Lieutenant Heflin said that, in July 2016, . . . the victim's Ford Ranger [was found] in the woods less than a mile from where the lieutenant arrested Defendant Duncan. . . . . In the vehicle, the lieutenant found three ATM receipts from declined transactions.

. . . .

The lieutenant noted that, when they went through the evidence, he saw pictures of the victim's family on the red digital camera found in Defendant Duncan's vehicle. . . . .

During cross-examination, Lieutenant Heflin testified that Defendant Duncan told him that he had received the ATM card[1] that he used on the morning of April 11, 2016, around the time that he used it. The lieutenant agreed that he first made contact with Defendant Duncan that same day after daylight, around 7:00 a.m. . . . .

---

[1] At the trial and post-conviction hearing, witnesses referred to the card used by the Petitioner interchangeably as an ATM, debit, or credit card. For consistency, we will refer to it as a debit card.

-5-

. . . .

Scott Levasseur, a lieutenant in the Cyber Crime Unit for the Dickson County Sheriff's Office, testified that he did what is referred to as a "data dump" on the phones in this case. . . . .

. . . .

Looking at the data dump for Defendant Shoffner's phone, Lieutenant Levasseur testified that the call log for the phone showed that it received a call from a contact listed as "Ariel," last four digits matching Defendant Robinson's phone, at 8:45 p.m. on April 10, 2016. That evening, the phone received and made calls to the contact "Chris," last four digits matching the phone for Defendant Duncan, and to a 1-800 number. Between 12:57 a.m. and 4:23 a.m., the phone received multiple calls from the phones of defendants Robinson and Duncan, including four missed calls from Defendant Duncan and one from Defendant Robinson between 1:10 a.m. and 6:50 a.m. There were also calls to and from phone number ending in -2919, which had no contact name associated with it. At 7:27 a.m. that same day, the phone received a seven-second call from Defendant Duncan's phone. The lieutenant said that this phone contacted the phones of defendant Robinson and Duncan more than any other contacts. The lieutenant noted that there appeared to be an email account linked with the phone, which showed the user name as "timshoffner4."

. . . .

Mr. [Thomas] Bell[, a criminal intelligence analysis] identified data from the cell phones associated with all three defendants. The mapping of the data from the phones showed that between 10:00 and 10:30 p.m. on April 10, 2016, all three phones were in use in the Clarksville area. The following morning, the morning of April 11, 2016, at around 1:00 a.m. the phones of defendants Duncan and Shoffner were using a tower in the vicinity of the victim's home in Ashland City. Thirty minutes later, Defendant Shoffner's phone was using a tower located north of the victim's house, and the phones of defendants Duncan and Robinson were using a tower to the southwest of the victim's house.

Mr. Bell testified that over the next two hours, Defendant Shoffner's phone indicated that he was using different towers, some by the F&M Bank in Clarksville. During that same time, the phones of defendants Duncan

and Robinson continued to be in use, pinging off the tower that was in the vicinity of the victim's house. Around 4:15 a.m., Defendant Shoffner's phone remained in Clarksville, while the phones of defendants Duncan and Robinson remained in use near the victim's house. Twenty minutes later, the phones of defendants Duncan and Robinson engaged towers just southeast of Clarksville, and, by 5:00 a.m., the phones were utilizing towers that were the same as the ones used . . . the previous evening.

At 7:20 a.m. Defendant Duncan's phone engaged a tower to the northeast of the Kangaroo Express, where he attempted to withdraw money using the victim's ATM card. The phone data showed that Defendant Shoffner received two calls from Defendant Duncan around that time, one at 7:11 a.m. and one at 7:20 a.m.

. . . .

Based upon this evidence, the jury convicted the defendants of the lesser-included offense of attempted second degree murder, the charged offenses of aggravated arson, especially aggravated kidnapping, aggravated robbery, and the lesser-included offense of theft of property valued at more than $2,500 but less than $10,000.

*Id.* at *4-13.

The Petitioner filed a pro se petition for post-conviction relief. Counsel was appointed and filed an amended petition. The amended petition alleged that the Petitioner received the ineffective assistance of trial counsel in the conviction proceedings.

At the post-conviction hearing on April 13, 2023, counsel for the Petitioner abandoned the ineffective assistance of trial counsel claim relating to the failure to request jury instructions for facilitation of a felony and accessory after the fact. The Petitioner stated that he had three attorneys representing him during his week-long trial. The Petitioner said that his trial counsel failed to stay in contact with him and did not show him a copy of the indictment until the trial. The Petitioner stated that his trial counsel failed to show him or challenge search warrants, failed to move to dismiss his arrest, failed to move to dismiss the theft of property count, failed to move to sever his trial from that of his codefendants, failed to object to evidence obtained from the Petitioner's car, and failed to make any objections during closing argument. The Petitioner stated that he believed he would not have been convicted had his attorneys filed those motions and raised those objections.

On cross-examination, the Petitioner testified that he was serving an eight-year community corrections sentence when he committed the present offenses. The Petitioner did not recall that he was convicted of a lesser-included theft offense and not the indicted theft charge. The Petitioner stated that counsel visited him only once while he was in custody and did not telephone him. He said the main mode of communication was by mail. The Petitioner acknowledged that his attorneys moved to suppress the Petitioner's statements made at the time of his arrest and that he testified at the suppression hearing. The Petitioner recalled that the trial court found his hearing testimony was not credible. The Petitioner said he was familiar with the facts of the offenses for which he was tried.

The Petitioner testified that he requested his trial be severed from his codefendants' trial. The Petitioner stated that he did not give officers consent to search his car but acknowledged that codefendant Shoffner gave him the victim's debit cards which the Petitioner had used at a convenience market. The Petitioner also acknowledged that he was in possession of the victim's "mail" at the time of his arrest.

First trial counsel[2] testified that he volunteered to help second trial counsel because he had more trial experience than she did. He did not recall whether he was recruited to help with the trial before or after pretrial motions had been filed. He said that he handled most trial witnesses and presented closing argument.

First trial counsel testified that no one identified the Petitioner as being at the victim's house until the victim identified the Petitioner at the trial. He said he cross-examined the victim regarding his identification of the Petitioner. According to first trial counsel, the defense strategy was to show that the codefendants were the "ring leaders" and that the Petitioner was only minimally involved.

First trial counsel testified that the evidence from the Petitioner's phone records showed the Petitioner was not in the vicinity of the victim's home. First trial counsel did not recall his closing argument or whether there was anything objectionable in the State's closing argument. According to first trial counsel, "unless there was something real, I guess, completely wrong with what was actually stated, I probably would not object because I wouldn't want to bring attention to it." He said that he wanted the jury "to basically pay attention to what the actual witnesses testified to." He stated that the Petitioner was being accused of debit card theft, not stealing the victim's car.

On cross-examination, first trial counsel testified that he and second trial counsel discussed discovery, trial strategy, and the strengths and weaknesses of the State's case

---

[2] The Petitioner was represented by three attorneys. We will refer to them as "first trial counsel," "second trial counsel," and "third trial counsel." Counsel are listed in the order of their post-conviction hearing testimony.

with the Petitioner. First trial counsel said that second trial counsel was primarily responsible for communicating with the Petitioner. First trial counsel said that he and second trial counsel discussed whether to sever the Petitioner's trial and told the Petitioner that it would benefit him to be tried with the codefendants "so [counsel] could point the finger at them during the trial." First trial counsel said the trial strategy was to make the Petitioner "look the least culpable."

First trial counsel testified that the Petitioner had implicated himself in the theft when he admitted to law enforcement that he used the victim's debit card at a convenience market. Counsel stated that he made several objections at the trial to issues that he felt were irrelevant and prejudicial. He said that his cross-examination of the victim focused on the victim's ability to view the Petitioner clearly during the kidnapping, such as whether the victim was wearing his glasses or whether the victim's view was impaired by lying on the floor.

First trial counsel testified that during closing argument he emphasized the fact that the Petitioner's cell phone data did not place the Petitioner at the victim's home. First trial counsel said that he and second trial counsel agreed the best strategy was to stress that although the Petitioner might be guilty of using a stolen debit card, no one identified him until the trial and that his cell phone did not place him at the victim's home.

First trial counsel testified that the evidence indicated that codefendant Shoffner stole the victim's truck and had the victim's debit cards. First trial counsel said that because the State used evidence regarding the victim's stolen truck solely against codefendant Shoffner, and not the Petitioner, first trial counsel did not object to evidence regarding the theft of the victim's truck. First trial counsel acknowledged that the Petitioner was convicted of a lesser theft charge than what was indicted. First trial counsel stated that his strategy decisions were based on his knowledge, experience, and discussions with the other trial counsel.

First trial counsel testified that he had no reason to object to the second search warrant requesting cell phone records. First trial counsel stated that the Petitioner was on community corrections at the time of his arrest, which allowed officers to conduct a search. First trial counsel said the Petitioner consented to the search of his car and was found to be in possession of the victim's bank account receipts at the time of his arrest. First trial counsel stated that officers already had a convenience store surveillance camera video recording of the Petitioner driving a blue Mercury Grand Marquis and using the victim's debit card and that the Petitioner admitted to officers that he used the victim's debit card. First trial counsel said that he was a zealous advocate for every client and that he filed motions and objected to evidence when appropriate.

Second trial counsel testified that she was appointed to represent the Petitioner and associated additional counsel due to the severity of the allegations against the Petitioner. She said that first trial counsel was lead trial counsel and that third trial counsel handled the motion to suppress. Second trial counsel said that she was present at all court appearances and that the legal representation duties were shared evenly among the three trial counsel. Second trial counsel said she spent "a lot" of hours on the Petitioner's case.

Second trial counsel testified that she communicated with the Petitioner primarily by letter but that she and first trial counsel visited the Petitioner in custody to discuss pretrial matters. Second trial counsel said that she and third trial counsel filed motions to suppress the Petitioner's statements to law enforcement and items found during the search of the Petitioner's car, both of which were denied.

Second trial counsel testified that there were two search warrants seeking cell phone records and that the first was issued before her appointment. She stated that she did not object to the first search warrant because the second search warrant cured defects in the first warrant. She testified that the Petitioner's cell phone data did not place the Petitioner at the victim's home. She stated that the Petitioner could be seen clearly on a surveillance camera video recording using the victim's debit card, which provided probable cause for his arrest. She stated that the indictment provided notice of the charges against the Petitioner and that she found no reason to object to the indictment. She said that because the Petitioner was not charged with theft of the victim's truck, the defense strategy was to persuade the jury that the Petitioner only had possession of a stolen debit card.

On cross-examination, second trial counsel testified that she, first trial counsel and the Petitioner discussed the indictment, discovery, the State's proof, possible defenses, and whether to request a severance of the Petitioner's trial. Second trial counsel stated that she spoke to the Petitioner by telephone and that she sent letters to the Petitioner in which she informed him about the case, including what was filed and trial strategy concerns. She said the Petitioner participated in his defense and appeared to understand what had been discussed.

Second trial counsel testified that she reviewed the second search warrant requesting cell phone records, that she did not find any deficiencies in the warrant, and that she did not identify any tactical reason to file a motion to suppress. She noted that if she had filed, and the court had granted, a motion to suppress the search warrant, the State could have applied for a new search warrant, curing any deficiencies. She stated that the officers had probable cause to arrest the Petitioner due to the surveillance camera video recording showing his using the victim's stolen debit card. She said that the officers performed a "pat down" of the Petitioner pursuant to the arrest and that the Petitioner consented to a search of the car. She stated that going to trial with the other

codefendants was a strategic decision designed to show the jury that the Petitioner's possession of a stolen debit card was minimal in comparison to the codefendants' actions. She stated that trial counsel made a collective strategic decision not to object to the State's closing argument to avoid drawing attention to certain issues. She said all trial counsel worked diligently on the case and provided a zealous defense.

After receiving the evidence, the post-conviction court denied relief. This appeal followed.

## ANALYSIS

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d

-11-

334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008).  This deference, however, only applies "if the choices are informed . . . based upon adequate preparation."  *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

## I

### Failure to File Motions to Suppress

The Petitioner contends that the post-conviction court erred in denying relief on his claim that his trial counsel were ineffective for failing to pursue a motion to suppress the search warrant for the Petitioner's cell phone data and for failing to pursue a motion to suppress items discovered as a result of the Petitioner's arrest.  The State argues that the post-conviction court properly denied relief because the Petitioner failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced by their failing to file the motions to suppress.  We agree with the State.

Our supreme court has said,

> to establish a claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence on Fourth Amendment grounds, the Petitioner must prove that (1) a suppression motion . . . would have been meritorious; (2) counsel's failure to file such a motion on such grounds was objectively unreasonable; and (3) but for counsel's objectively unreasonable failure to raise this particular issue in a suppression motion, there is a reasonable probability that the verdict would have been different absent the excludable evidence.  The Petitioner must prove all three of these prongs in order for his claim of ineffective assistance of counsel to succeed.

*Phillips v. State*, 647 S.W.3d 389, 405 (Tenn. 2022).

*1.     Failure to Move to Suppress the Search Warrant for Cell Phone Data*

The Petitioner contends that trial counsel should have filed a motion to suppress the search warrant requesting the Petitioner's cell phone data because no probable cause existed for the search warrant, as the warrant failed to identify a nexus between the criminal activity, the place to be searched, and the items to be seized.

-12-

Our standard of review in determining whether a search warrant is based upon probable cause is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993). "In reviewing the existence of probable cause for issuance of a warrant, we may consider only the affidavit and may not consider any other evidence known by the affiant or provided to or possessed by the issuing magistrate." *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005). A supporting affidavit must establish a nexus between the criminal activity, the place to be searched, and the things to be seized. *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002)). "Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." *Reid*, 91 S.W.3d at 275.

The affidavit in support of the warrant stated that the victim was assaulted, bound and robbed at his home, that the victim's assailants attempted to shoot him, that the victim's assailants set fire to his home, that debit cards were stolen from the victim, that codefendant Shoffner was identified as using the victim's debit card, that a video recording showed that the victim's debit card was used at a convenience store by a man driving a "dark blue [Mercury] Grand Marquis" car, that codefendant Shoffner identified the Petitioner as driving a dark blue car, that codefendant Shoffner identified the Petitioner's location, that the Petitioner was found at that location, that the Petitioner drove a blue Mercury Grand Marquis and possessed some of the victim's paperwork, that the Petitioner admitted to using the victim's debit card at the convenience store, that the Petitioner gave consent to search his car, that the Petitioner's cell phone was found during the search of his car, that the Petitioner was associated with codefendant Shoffner, and that the Petitioner's cell phone had called and received calls from codefendant Shoffner's cell phone multiple times on the date of the kidnapping. The record reflects that the affidavit contained information connecting the Petitioner's cell phone to the criminal activity that occurred at the victim's home. *See Saine*, 297 S.W.3d at 206.

In denying relief, the post-conviction court found that the testimony of first and second trial counsel was credible and that no legal basis existed to support a motion to suppress. The post-conviction court found that the Petitioner failed to show that a motion to suppress would have been meritorious. *See Phillips*, 647 S.W.3d at 405. The evidence does not preponderate against the post-conviction court's findings and its determination that trial counsel were not deficient. The Petitioner is not entitled to relief on this basis.

2.      *Failure to Move to Suppress the Fruits of the Petitioner's Arrest*

The Petitioner contends that trial counsel should have filed a motion to suppress the evidence obtained as a result of the Petitioner's arrest because no probable cause

existed for the arrest, as no physical evidence linked the Petitioner to the victim at the time.

"[P]robable cause exists when 'at the time of the [seizure], the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" *State v. Dotson*, 450 S.W.3d 1, 50 (Tenn. 2014) (citation omitted). The record reflects that before arresting the Petitioner, the officers were aware that a video recording showed that the victim's debit card was used at a convenience store by a man driving a "dark blue [Mercury] Grand Marquis" car, that codefendant Shoffner identified the Petitioner as driving a dark blue car, that codefendant Shoffner identified the Petitioner's location, and that the Petitioner was found at that location driving a dark blue car. The record reflects that Lieutenant Heflin testified that the Petitioner was arrested after being provided *Miranda* warning and after admitting that he had used the victim's debit card. First trial counsel testified that he did not move to suppress evidence obtained as a result of the Petitioner's arrest because the Petitioner was on community corrections at the time of his arrest allowing for a search, officers already had a surveillance recording of the Petitioner using a stolen debit card at the convenience store, and the Petitioner admitted to officers that he used the stolen card. Second trial counsel testified that she did not challenge the Petitioner's arrest because the surveillance recording provided probable cause for the arrest. The record reflects that officers were aware of information linking the Petitioner to the victim at the time of the Petitioner's arrest.

The post-conviction court, crediting counsels' testimony, found that a motion to suppress would not have been meritorious and that trial counsel were not deficient for not moving to suppress the evidence obtained from the arrest. *See Phillips*, 647 S.W.3d at 405. The evidence does not preponderate against the post-conviction court's findings and determinations. The Petitioner is not entitled to relief on this basis.

## II

### Failure to Move to Sever the Trial

The Petitioner contends that the post-conviction court erred in denying relief on his claim that his trial counsel were ineffective for failing to file a motion to sever the Petitioner's trial from that of his codefendants. Specifically, the Petitioner argues that the substantial evidence against his codefendants "spilled over" and prejudiced the Petitioner, against whom less evidence existed. The State argues the post-conviction court properly denied relief because trial counsel's decision not to sever the Petitioner's trial was a strategic choice made in the exercise of reasonable professional judgment. We agree with the State.

-14-

In denying relief on this basis, the post-conviction court found that the testimony of first and second trial counsel was credible and that the decision not to sever the trial was strategic. First trial counsel testified that the Petitioner had not been identified before the trial as being at the victim's home. First and second trial counsel testified that their trial strategy was to "point the finger" at the codefendants, against whom there was overwhelming evidence, and show, by comparison, that the Petitioner was far less culpable. First trial counsel testified that he and second trial counsel discussed trial strategy with the Petitioner and explained the benefit of going to trial with his codefendants. The record supports the court's findings that trial counsel made a strategic decision not to request a severance and that the decision was informed and based upon adequate preparation. *See Cooper*, 847 S.W.2d at 528. The Petitioner is not entitled to relief on this basis.

## III

### Failure to Move to Dismiss Count Five of the Indictment

The Petitioner contends that the post-conviction court erred in denying relief on his claim that his trial counsel were ineffective for failing to file a motion to dismiss count five of the indictment, charging the Petitioner and codefendants with theft of property valued at more than $10,000, and for failing to object to evidence relating to the theft of the victim's truck. According to the Petitioner, the fact that the Petitioner was included in count five of the indictment suggested that the Petitioner stole the victim's truck. The State argues that the post-conviction court properly denied relief because trial counsel's decision not to seek to dismiss the indictment was supported by case law and trial counsel's failure to object to evidence of the theft of the victim's truck was a strategic choice made in the exercise of reasonable professional judgment. We agree with the State.

Second trial counsel testified that she did not find any deficiencies in the indictment because it provided notice of the charges against the Petitioner. Second trial counsel stated that the Petitioner was not charged with theft of the victim's truck and that she did not consider count five of the indictment to include the victim's truck. First and second trial counsel testified that they made a strategic decision not to object at the trial to evidence regarding the truck because the evidence implicated codefendant Shoffner and not the Petitioner. In denying relief on this basis, the post-conviction court found that the indictment was legally sound and that the testimony of first and second trial counsel was credible.

The post-conviction court found that trial counsel made a strategic decision not to move to dismiss count five of the indictment or object to evidence regarding the victim's

truck and that trial counsel's decisions were informed and based upon adequate preparation. *See Cooper*, 847 S.W.2d at 528. The record supports the post-conviction court's findings and determinations. The Petitioner is not entitled to relief on this basis.

## IV

### Failure to Request Facilitation or Accessory After the Fact Jury Instructions

The Petitioner contends that the post-conviction court erred in denying relief on his claim that his trial counsel were ineffective for failing to request the jury be instructed on either facilitation of a felony or accessory after the fact as possible lesser included offenses to the conviction offenses. Specifically, the Petitioner asserts that the victim's inaccurate recollection and impeachable identification of the Petitioner provided a basis for the instructions. The State argues that the post-conviction court properly denied relief because this issue is waived. We agree with the State.

In denying relief on this basis, the post-conviction court found that "[t]he Petitioner's Counsel conceded that there was no evidence in the record to support this claim." The record reflects that the Petitioner's counsel specifically abandoned this claim at the post-conviction hearing. *See* T.C.A. § 40-30-106(g) (2018) (providing generally that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"). The Petitioner is not entitled to relief on this basis.

## V

### Failure to Object to the State's Closing Argument

The Petitioner contends that the post-conviction court erred in denying relief on his claim that his trial counsel were ineffective for failing to object when the prosecutor vouched for the victim's credibility during closing argument. The prosecutor stated, "[The victim] hasn't ID'd [the Petitioner] until this week because he wasn't asked until this week to identify [the Petitioner]. That's why." The Petitioner attests that it was impermissible "witness vouching" to allow the prosecutor to explain why the victim had not previously identified the Petitioner as an assailant. The State argues that the post-conviction court properly denied relief because trial counsel's decision not to object during closing argument was a strategic choice made in the exercise of reasonable professional judgment. We agree with the State.

In denying relief on this basis, the post-conviction court found that the testimony of first trial counsel was credible. First trial counsel testified that he addressed the

victim's identification of the Petitioner during the trial by cross-examining the victim regarding the victim's vision and the fact that the victim had not previously identified the Petitioner as being at the victim's home. First trial counsel stated that he would have objected if the prosecutor said something that was "completely wrong." However, first trial counsel said that failing to object during the State's closing argument was a tactical decision to avoid drawing attention away from the victim's trial testimony. The post-conviction court found that trial counsel's strategic decision not to object was an informed one and based upon adequate preparation. *See Cooper*, 847 S.W.2d at 528. The record supports the post-conviction court's findings and determinations. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE